HADLOCK, P. J.
*1124 *487 Claimant seeks review of an order of the Workers' Compensation Board upholding SAIF's award of temporary disability benefits for an accepted claim for low back strain and SAIF's denial of a new/omitted medical condition claim for a low back condition described as "L4-5 annular injury." We review the board's order for errors of law and substantial evidence. ORS 656.298 ; ORS 183.482(7) - (8). We conclude that the board erred with respect to the calculation of benefits for temporary disability and therefore reverse and remand that portion of the order; we otherwise affirm.
The board's order adopted the findings of the administrative law judge (ALJ) with supplementation. We therefore draw our summary of the facts from the findings in both orders, which are largely undisputed. Claimant, a journeyman welder, injured his back at work on March 23, 2015, while handling a heavy piece of steel. A chiropractor diagnosed a "disc injury" and authorized claimant to be off work from March 25, 2015 through April 2, 2015. A few days later, claimant saw an urgent care physician, who ordered an MRI. Although the MRI showed bulges at several disc levels as well as two areas of disc protrusion, the physician reported "largely degenerative findings" and "nothing that appeared to be surgical or emergent." He recommended physical therapy and released claimant to modified work.
On April 1, 2015, SAIF accepted a claim for lumbar strain and, on April 6, began paying benefits for time loss from March 28, 2015. SAIF calculated claimant's average weekly wage as $ 986.80, based on a five-day work week from Monday through Friday. But SAIF subsequently recalculated claimant's benefits based on its review of employer's payroll records and, on April 20, 2015, notified claimant that his average weekly wage was only $ 863.46. Claimant requested a hearing, contesting the "procedural disability rate" and also seeking "procedural temporary disability" benefits from March 23, 2015 to May 12, 2015, penalties, and attorney fees.[1]
*488 In the meantime, claimant had continued to experience low back pain and, in early April, he saw Dr. Brett, a neurosurgeon, who diagnosed "severe and worsening [discogenic] low back pain with left greater than right lower extremity radicular pain from L3-4, L4-5, and/or L5-S1 lumbar disc injuries superimposed on lumbosacral strain sustained in a work injury." Brett continued claimant's time loss authorization. A few weeks later, claimant saw another doctor at the same clinic, who also diagnosed a "possible annular injury at left L3-4 and/or L4-5, likely with referred pain in the left leg."
At SAIF's request, claimant then saw Dr. Carr, an orthopedic surgeon. In his written report, Carr diagnosed a lumbar strain and preexisting degenerative disc disease. Carr stated that there was no evidence that a "lumbar disc injury at L4-5 has occurred." But he opined that claimant had sustained a moderately severe strain, was not able to work in his current condition, and needed a vigorous physical therapy program of six to eight weeks. SAIF subsequently denied a "lumbar disc injury L3-4 or L4-5 [left]."
Claimant had further imaging, which Brett read to show significant bulges at L4-5 and L5-S1, but no significant nerve impingement. Brett diagnosed discogenic pain and opined that the work injury was the major contributing cause of claimant's condition and need for treatment. In June 2015, claimant initiated a new/omitted medical condition claim for L4-5 annular injury, L4-5 disc protrusion, and L4-5 bilateral nerve root impingement.
*1125 SAIF denied the claimed conditions in August, and claimant requested a hearing. On September 21, 2015, claimant was determined to be medically stationary on the accepted lumbar strain.
After SAIF's denial of the new/omitted medical condition claim, claimant returned to Brett because of continued symptoms, and Brett opined that claimant had a left L4-5 annular injury, possibly herniated, causing radiculopathy. Carr countered that impression in a concurrence letter, explaining that imaging did not show that claimant had an "annular injury" or any acute injury to the disc. Rather, Carr believed that if, hypothetically, claimant had *489 an annular tear, it was degenerative in origin and unrelated to his work. Additionally, Carr opined that the minimal bulging revealed by imaging did not amount to a disc protrusion and was not related to claimant's work. Finally, Carr opined that claimant did not have nerve root impingement at L4-5.
An ALJ upheld SAIF's denial of the new/omitted condition claim for annular injury and L4-5 disc protrusion with nerve impingement, as did the board. In its order, the board discussed the opinions given by both Carr and Brett and explained why, in light of Carr's opinion and what the board suggested was Brett's failure to adequately explain his different opinion, the board was not persuaded that claimant had a compensable L4-5 annular injury. Claimant challenges that determination on judicial review, contending that, in its analysis, the board committed legal error by requiring claimant to establish the existence of the claimed annular injury. We conclude that there was no error.
The argument that claimant makes on judicial review is one that we rejected in De Los-Santos v. Si Pac Enterprises, Inc. , 278 Or. App. 254, 257, 373 P.3d 1274, rev. den. , 360 Or. 422, 383 P.3d 857 (2016). In that case, the claimant argued that, to prevail on a new or omitted condition claim for radiculopathy / radiculitis, she had only to establish that her claimed symptoms were attributable to her work injury. Id . at 256, 373 P.3d 1274. Therefore, the claimant asserted, she was not "required to demonstrate that her claimed radiculitis /radiculopathy condition exists." Id . We disagreed, holding that, "to prevail on a new or omitted condition claim under ORS 656.267, a claimant must establish-with medical evidence-that the claimant, in fact, has a condition " and that proof of "mere symptoms" is insufficient. Id . at 257, 373 P.3d 1274 (emphasis in original). We have subsequently reiterated that holding in other cases. See DeBoard v. Meyer , 285 Or. App. 732, 737-38, 397 P.3d 37, rev. den. , 361 Or. 885, 403 P.3d 770 (2017) ; SAIF v. Williams , 281 Or. App. 542, 548, 381 P.3d 955 (2016). In briefing this case, claimant provided a bare "cf ." cite to De Los-Santos but did not attempt to explain how the argument he makes on judicial review can prevail in light of the holding in that case or the others that have followed it. We reject without further *490 discussion claimant's argument that he was not required to prove the existence of the annular injury.[2]
We next address claimant's assignments of error relating to temporary total disability benefits. On the hearing request form, claimant checked the box "temporary disability rate" in the section for stating the reasons for the request for hearing. He also checked *1126 the box "procedural temporary disability," and specified the period March 23, 2015 to May 12, 2015. Claimant subsequently explained that he intended to raise the question of an underpayment during that initial period, even if SAIF's calculation of the disability rate was correct.
At the start of the hearing, the ALJ asked the parties whether the temporary disability issue was the "time loss rate," and the parties agreed. Claimant's counsel did not at that time assert an underpayment of temporary disability benefits for the initial period from March 23 to May 12. But, in closing argument, claimant's counsel asserted that claimant had been underpaid temporary disability benefits during a longer period, from March 30 through September 21. The ALJ's order only addressed the time loss rate (which we discuss later in this opinion) and did not address the issue of an underpayment of temporary disability benefits during either the initial period or the longer period that claimant mentioned for the first time in closing argument.
*491 Before the board, claimant asserted that the ALJ had erred in failing to address the underpayment issue. The board declined to address the question. The board reasoned that, because claimant had not advised the ALJ at the start of the hearing of the underpayment issue, claimant had waived it, even with respect to the initial period of March 23 to May 12. The board also noted that, in the request for hearing, claimant had identified the disputed period of time loss as only that initial period and not as the longer period of March 24 to September 21. The board explained its practice of not considering issues raised for the first time in closing argument, and it declined for that reason to address claimant's contention that he was entitled to temporary disability benefits for that additional, longer period of time.
On judicial review, claimant does not separately address the board's rationale with respect to the additional period that extended from May 13 (the end of the initial period that claimant had identified in his request for hearing) to September 21, but contends broadly that, because the issue of entitlement to temporary total disability had been raised in the request for hearing, the board was required to address it. As we held in Fred Meyer Stores v. Godfrey , 218 Or. App. 496, 501, 180 P.3d 98 (2008), the board has plenary authority under ORS 656.726(5) to create and enforce rules regarding preservation. "Implicit within that grant of authority is the authority to determine what circumstances will suffice to preserve an issue before the board." Id . at 501-02, 180 P.3d 98.
Considering the board's authority, we first conclude that the board did not err in declining to address claimant's entitlement to additional temporary total disability for the period May 13 to September 21, based on a lack of preservation. Indeed, claimant has not explained on judicial review why the board should have considered claimant's entitlement to additional benefits during that period, so we do not address the matter further.
With respect to its conclusion relating to the period of March 23 to May 12, the board noted its precedent that an issue raised in a hearing request may be waived if it is not included in a subsequent statement of the issues agreed *492 to by the parties. Claimant, the board concluded, "relinquished" the "procedural temporary disability" issue by failing to advise the ALJ that the issue was in dispute at the start of the hearing. On judicial review, claimant now contends that the board erred in reaching that conclusion based on "waiver." Waiver, claimant points out, is "the intentional relinquishment of a known right," Drews v. EBI Companies , 310 Or. 134, 150, 795 P.2d 531 (1990), and there is no indication that, in failing to mention the issue of the underpayment at the start of the hearing, claimant's counsel intended to waive it. In fact, claimant contends, the record, especially claimant's closing argument, supports the opposite conclusion-that claimant's counsel believed the question was still at issue.
As we said in Wright Schuchart Harbor v. Johnson , 133 Or. App. 680, 686, 893 P.2d 560 (1995), whether a waiver has occurred is resolved by examining the particular circumstances of each case. In Wright Schuchart Harbor , in a request for hearing, *1127 the claimant checked boxes indicating that the "reasons" for her request included "aggravation" and "medical services." Id. at 682, 893 P.2d 560. At the start of the hearing, the parties agreed that "the sole issue in this proceeding is the compensability of an alleged aggravation." Id. The referee's order upheld the denial of benefits for medical services on the ground that the claimant had not established the requisite causal connection between her compensable knee injury and the worsened condition. The board affirmed and adopted the referee's order, but noted additionally, "By agreeing with the Referee's conclusion that claimant has failed to prove a compensable aggravated claim, we do not mean to suggest that claimant cannot assert a valid medical services claim under ORS 656.245." Id . at 683, 893 P.2d 560. The claimant moved for abatement and reconsideration, contending that she had already established a valid medical services claim. The employer opposed the motion, asserting that the board should decline to address whether the claimant had established her medical services claim, because the issue had not been raised at the hearing. The board held that, "[w]ithout an express declaration *** that claimant no longer wished to pursue the medical services issue, we find that she did not waive that question." Id . at 684, 893 P.2d 560. *493 On the employer's petition for judicial review, we reversed on the question of waiver. We explained, citing Drews , that, although a waiver must be an intentional relinquishment of a known right, a valid waiver need not be explicit-it may be implied from a party's conduct. Id. at 686, 893 P.2d 560. We concluded that the board's requirement of a "bright line" explicit disclaimer was therefore erroneous. Id. Additionally, we explained, the question whether a waiver has occurred must be resolved "by examining the particular circumstances of each case." Id . at 686, 893 P.2d 560. We held that the board had failed to engage in that inquiry because it had not considered whether, as a factual matter, the claimant's counsel had "actually evinced and expressed an intent to relinquish a known right." Id . We therefore remanded the case to the board for it to consider in the first instance whether the claimant "actually intended to waive a known right to assert a claim for medical services" based on the totality of the circumstances. Id. at 688, 893 P.2d 560. In doing so, we noted the relationship between medical services and aggravation, and explained that-because of that relationship-the claimant's agreement that the sole issue at hearing was "aggravation" did not necessarily preclude her from arguing entitlement to medical services. The "meaning and effect of claimant's counsel's statements" therefore remained for the board to decide. Id .
Here, the board concluded that, because claimant agreed at the start of the hearing with the ALJ's description of the temporary disability issue as the "time loss rate," claimant had relinquished, i.e. , waived, the "procedural disability issue" identified in the hearing request. We conclude, as we did in Wright Schuchart Harbor , that the board's analysis is incomplete. Given the close relationship between the two issues of entitlement to "procedural" time loss (i.e. , procedural temporary disability) and the rate at which that entitlement would be calculated, claimant's attorney's agreement with the ALJ's description of the issues does not necessarily constitute a waiver of the entitlement question. Accordingly, as in Wright Schuchart Harbor , the case must be remanded so that the board can address the question of waiver-that is, "whether claimant actually intended to waive a known right to assert a claim"
*494 for additional temporary disability from March 23, 2015 to May 12, 2015-in the first instance.
The remaining issue is whether the board erred in upholding SAIF's calculation of claimant's average weekly wage. Broadly speaking, as with other averages, an "average weekly wage" can be conceived as a fraction, with the amount of wages earned during a particular period of time divided by the number of weeks worked during that period. Administrative rules govern the way in which that fraction is calculated under the circumstances presented here. As the board correctly found, claimant, who was paid an hourly wage, had had a pay raise during his employment with employer and was entitled *1128 to have his average weekly wage calculated based solely on that higher pay. OAR 436-060-0025(5)(a)(B)(i) (Apr. 1, 2011). Additionally, claimant had worked fewer than 52 weeks with employer at the time of injury. In those circumstances, OAR 436-060-0025 (5)(a)(A) (Apr. 1, 2011),[3] the administrative rule in effect at the relevant time, provided the method for calculating claimant's average weekly wage, requiring that calculation to be based on "the actual weeks of employment." The board found that claimant worked a five-day week of Monday through Friday, that claimant's first work day was Friday, November 21, 2014, and that he was injured on Monday, March 23, 2015. The board found that "SAIF calculated claimant's average weekly wage based on his weekly earnings starting November 16, 2014 (the beginning of the work week in which he started working) through *495 March 28, 2015 (the end of the work week in which he was injured)."[4]
Claimant contended before the ALJ and the board that the first week of employment should only be considered a partial week for purposes of calculating the average weekly wage. In rejecting claimant's contention, the board explained that it understood the rule's reference to "actual weeks of employment" to require the "average weekly wage" calculation to include the entirety of the first week of a claimant's employment and the entire week of employment in which the claimant was injured, even if the claimant did not work on every work day during those weeks. Put differently, the board determined that the denominator of the "average weekly wage" fraction must include an entire work week for any week during which a claimant worked even a single day. On judicial review, claimant challenges that determination, and we agree with claimant that the board is mistaken.
The board's discussion focuses on the rule's requirement that the average weekly wage be calculated based on the "actual weeks of employment." OAR 436-060-0025 (5)(a)(A) (Apr. 1, 2011). The rule does not define the term "actual weeks." In the absence of any definition, the board and SAIF appear to interpret the term "actual weeks" to mean "whole weeks." We do not understand why that should be so. In the abstract, "actual weeks" could perhaps be understood to mean either "whole weeks," as the board and SAIF contend, or the total amount of weeks-including partial weeks-in which a claimant "actually" worked. Consideration of context, however, leads us to *496 conclude that only the latter understanding of the term comports with legislative intent.
The statute that governs payment of temporary total disability benefits specifies that the worker generally is entitled to receive "total disability compensation equal to 66-2/3 percent of wages," but with limitations, including that the worker not receive "more *1129 than 133 percent of the average weekly wage." ORS 656.201(1). The broad mandate that a worker receive an amount equal to two-thirds "of wages" reflects a legislative intention that the worker's disability benefits be based on the "wage" that the worker has actually earned. Moreover, ORS 656.210(2)(a)(A) provides that, generally speaking, the weekly wage of a worker is calculated "by multiplying the daily wage the worker was receiving by the number of days per week that the worker was regularly employed." Again, that provision reflects legislative intention that an injured worker's temporary total disability benefits be calculated based on the worker's actual earnings. Indeed, we have held that "benefits for temporary total disability exist for the purpose of compensating a worker for wages lost because of an inability to work." Bostick v. Ron Rust Drywall , 138 Or. App. 552, 559, 909 P.2d 904 (1996). OAR 436-060-0025(5)(a)(A) (Apr. 1, 2011)-an implementing regulation-must be interpreted consistently with that legislative mandate to compensate the worker for wages that have actually been lost. See Concrete Cutting Co. v. Clevenger , 191 Or. App. 157, 162, 81 P.3d 723 (2003) ("Based on the * * * direction [of ORS 656.210 ], we conclude that the underlying purpose of OAR 436-060-0025 is to determine or approximate, to the extent possible, the worker's wage at the time of injury based on existing employment circumstances.").
The board's and SAIF's interpretation of OAR 436-060-0025(5)(a)(A) (Apr. 1, 2011) can result-as occurred here-in calculation of an "average weekly wage" that does not reflect the worker's actual average wage at the time of injury. Rather, when whole weeks are included in the denominator of the "average weekly wage" fraction for the worker's first and last weeks, even when a worker did not work the usual number of days during those weeks, the resulting fraction is smaller than it should be-that is, it reflects *497 a calculated "average weekly wage" that is less than what the worker actually earned, on average, each week during the period that he or she was employed.[5] Interpreting the rule to give that result is contrary to the legislature's intention, described above, to base disability benefits on what the worker actually earned.
In sum, we conclude that OAR 436-060-0025 (5)(a)(A) (Apr. 1, 2011) requires the "average weekly wage" to be calculated using the "actual weeks of employment"-that is, the actual number of whole and partial weeks that the claimant worked. In this case, the record shows that claimant worked only partial weeks both during the first week in which he was employed and during the last week of employment before he became disabled. OAR 436-060-0025(5)(a)(A) (Apr. 1, 2011) therefore requires inclusion of only a partial week of employment for each of those two weeks in the denominator of the "average weekly wage" calculation, reflecting the portion of the five-day work week that claimant actually worked during each of those weeks.
Determination of benefits for temporary disability reversed and remanded; otherwise affirmed.

The term "procedural" temporary disability benefits (or "procedural time loss") is commonly used to refer to temporary disability benefits to which a claimant is procedurally entitled on an opened claim. See Lebanon Plywood v. Seiber , 113 Or. App. 651, 653-54, 833 P.2d 1367 (1992) (describing "procedural" and "substantive" temporary disability benefits).

We also note that it is not clear that the board's determination rested solely on a conclusion that claimant had not established the existence of the claimed condition. The board did recite that, to prove the compensability of a new/ omitted condition, a claimant must prove that the claimed condition exists. And the board's order suggests that it was not persuaded by the medical evidence that the claimed annular injury and L4-5 disc protrusion existed. But the board also noted that Brett had not explained how claimant's increasing pain and other matters that developed over the summer of 2015 "proved the existence of an L4-5 annular injury in relation to the March 27, 2015 work incident ." (Emphasis added.) In other words, the order can be read to suggest that the board was not persuaded by Brett's opinion that any L4-5 annular injury was work related. Such a determination, independent of the question whether claimant had established the existence of the condition, would be dispositive. We acknowledge, however, that the board's order does not clearly state that it rejected claimant's argument for that reason, and not because claimant failed to persuade the board that the injury existed. Accordingly, we assume for purposes of this decision that the board's determination did rest on its conclusion that claimant had not proved the existence of the claimed condition.

OAR 436-060-0025(5)(a)(A) (Apr. 1, 2011) is a rule of the Director of the Department of Consumer and Business Services and provides, in part:
"The rate of compensation for workers regularly employed, but paid on other than a daily or weekly basis, or employed with unscheduled, irregular or no earnings shall be computed on the wages determined by this rule.
"(a) For workers employed seasonally, on call, paid hourly, paid by piece work or with varying hours, shifts or wages:
"(A) Insurers must use the worker's average weekly earnings with the employer at injury for the 52 weeks prior to the date of injury. *** For workers employed less than 52 weeks *** insurers must use the actual weeks of employment *** with the employer at injury or all earnings, if the worker qualifies under ORS 656.210(2)(b) and OAR 436-060-0035, up to the previous 52 weeks."

In that regard, the board made a partly incorrect factual finding. As noted, an average weekly wage is calculated by dividing the amount of wages earned by the number of weeks worked. The record shows that, as the board found, SAIF's calculation of claimant's average weekly wage was based on including an entire week in the denominator of that fraction for the first week in which claimant worked. That is, SAIF included an entire week in the denominator for the week starting November 16, 2014, even though claimant worked only one day-Friday-during that week. But-contrary to the board's finding-SAIF did not similarly include an entire week in the denominator for the last week in which claimant worked. Rather, in calculating claimant's "average weekly wage," SAIF noted that claimant had worked only one day during his last week-a Monday-and it correspondingly included only part of that work week (1/5th of a week) in the denominator of its equation. SAIF has not endeavored to explain why it took different approaches with respect to those two weeks.

To think about it another way, consider a salaried employee who earns $ 5,000 per month. If the employee started work on July 16 and is asked, on September 30, what her salary is, her response will be "$ 5,000 per month," even though she received only $ 2,500 for her work in July. She will not conceive of her average monthly salary as $ 4,166.67, the result that would follow if she divided her total earnings through September 30 ($ 12,500) by three entire months, instead of the two and one-half months that she actually worked. Yet that is analogous to the calculation that the board and SAIF assert is required here.